# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ronnie Jackson; Joshua Jones;
Shane Kringen; Mitchell Osterloh;
and Jesse Plentyhorse,

      Plaintiffs,

v.

Sharlene Mike-Lopez,

      Defendant.

Civ. No. 17-4278 (JRT/BRT)

**REPORT AND RECOMMENDATION**

Ronnie J. Jackson, OID #239471, Joshua Jones, OID #222266, Shane Kringen, OID # 178338, Jesse Plentyhorse, OID #235901, MCF-Oak Park Heights, 5329 Osgood Avenue North, Stillwater, MN 55082, and Mitchell Osterloh, OID #214579, MCF-St. Cloud, 2305 Minnesota Blvd. SE, St. Cloud, MN, 56304, *pro se* Plaintiffs.

Kevin Jonassen, Esq., Assistant Attorney General, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

*Pro se* Plaintiffs Ronnie Jackson, Joshua Jones, Shane Kringen, Mitchell Osterloh, and Jesse Plentyhorse, inmates in the custody of the Minnesota Department of Corrections, bring claims for violations of their constitutional rights under 42 U.S.C. § 1983. (Doc. No. 1, Compl.) Plaintiffs alleged claims for unconstitutional conditions of confinement and deliberate indifference to their medical needs in violation of the Eighth Amendment, denial of due process under the Fourteenth Amendment, and deprivation of religious freedom in violation of the First Amendment. (*See id.*) The Court dismissed

Plaintiffs' claims against all Defendants regarding medical care, due process, and religious freedom, and dismissed the conditions of confinement claim against all Defendants except for Defendant Sharlene Mike-Lopez. (Doc. No. 97, Order Adopting Report and Recommendation.)

The remaining claim against Defendant Mike-Lopez relates to the conditions of confinement in the Administrative Control Unit while Plaintiffs were housed there. Defendant Mike-Lopez now moves for summary judgment on that remaining claim pursuant to Fed. R. Civ. P. 56. (Doc. No. 118.) Plaintiffs have not filed a response to that motion, nor have they produced evidence in this matter beyond the declarations and exhibits filed alongside their Complaint. For the reasons that follow, this Court recommends that Defendant's Motion for Summary Judgment be granted.

## I.     Background

As mentioned, none of the Plaintiffs in this matter responded to Defendant's Motion for Summary Judgment as set forth in this Court's July 26, 2019, Order.[1] (Doc. No. 126.) Even when a motion for summary judgment is unopposed, the Court must determine whether the moving party is entitled to summary judgment in accordance with the law and relevant facts. Accordingly, this Court will consider the motion on its merits based on the record, including Plaintiffs' Declarations and Exhibits filed

---

[1]     Ronnie Jackson has subsequently been released and is under supervision. (*See* Doc. No. 127.)

2

contemporaneously with their Complaint. [2] *See Gibanti v. Rice*, 2013 WL 3338684, *3 (D. Minn. July 1, 2013). (*See* Doc. Nos. 3–7, Pls.' Decls.; Doc. No. 8, Pls.' Exs.)

### A.    Plaintiffs' Factual Allegations

According to their Complaint and accompanying declarations, Plaintiffs were incarcerated at Minnesota Correctional Facility – Oak Park Heights ("MCF-OPH") and subjected to unconstitutional conditions in that facility's Administrative Control Unit ("ACU") between May 1, 2017, and July 31, 2017. [3] (Compl. 1–2; Doc. Nos. 3–7.) The Court has reviewed the factual evidence presented in Plaintiffs' Declarations relating to the remaining claim and summarizes it below.

Plaintiff Ronnie Jackson alleges that the ACU was "almost complete sensory deprivation." (Doc. No. 3, Jackson Decl. ¶ 5.) He claims to have been locked down twenty-four hours a day, seven days a week. (*Id.* ¶ 6.) Jackson claims he did not receive recreation and had no human contact other than with staff. (*Id.*) He states that the lights remained on constantly, that the noise level in the ACU was extraordinarily loud due to other inmates banging on doors and screaming, and that each of the three different rooms he stayed in had feces and human waste on the ceiling and walls. (*Id.* ¶¶ 6–7.) Jackson further alleges there was no clean air flow in his cell, that there were small bugs present

---

[2]    Plaintiff Joshua Jones did not provide any such Declaration.

[3]    According to Defendant, Jackson was housed in the ACU from January 2, 2017, to July 26, 2017; Jones was housed in the ACU from November 21, 2016, to June 21, 2017; Kringen was housed in the ACU from April 6, 2017, to August 9, 2019; Osterloh was housed in the ACU from January 18, 2017, to July 26, 2017; Plentyhorse was housed in the ACU from May 29, 2017, to August 17, 2017. (*See* Doc. No. 119, Def.'s Mem. 4–5.)

that would crawl on him and bite him, laundry was returned dirty, and there was no privacy and he was subjected to public view when showering and using the toilet. (*Id.* ¶ 7.)

Plaintiff Shane Kringen claims that his cell had feces and bodily fluids on the floor and wall, and that he was not given gloves to clean up his cell. (Doc. No. 7, Kringen Decl. ¶¶ 2–3.) Kringen claims that he experienced sensory deprivation, that insects were present in his cell, and that other inmates in the ACU were screaming, kicking, and smearing their feces on cells. (*Id.*) Kringen also complains of the lack of privacy and the fact that groups of visitors would sometimes surprise him as he was using the restroom or trying to shower. (*Id.* ¶ 3.)

Plaintiff Mitchell Osterloh states that there was fecal matter on his cell's ceiling and insects "all over [his] cell." (Doc. No. 6, Osterloh Decl. ¶ 3.) He claims that he had no privacy because of citizen tours and was viewed by members of the public both while showering and while using the restroom. (*Id.*) Osterloh claims that ventilators were stopped and consequently there was no air circulation, the noise level was extraordinary due to the conduct of other inmates, and the lights were kept on twenty-four hours a day. (*Id.*) His shower was also unclean and at one point flooded with sewer water. (*Id.*) Osterloh states that these conditions made it extremely hard to sleep or concentrate, and that he experienced sensory deprivation. (*Id.* ¶¶ 3, 5.)

4

Plaintiff Marvin Franco-Morales states that two of the three cells he was held in had feces stains on the walls.[4] (Doc. No. 5, Franco-Morales Decl. ¶ 3.) The cells were also infested with ants and spiders, and he suffered bug bites. (*Id.*) Franco-Morales claims that offenders in the ACU were forced to exercise in indoor recreation rooms filled with dust and dirt, dead worms, and bird feces. (*Id.*) Franco-Morales further claims that he was never provided with cleaning supplies to maintain his cells, and that he had to clean them using his towel with soap and water. (*Id.*) He also complains of a lack of privacy while using the bathroom or showering due to people walking by as well as to the placement of cameras. (*Id.*)

Plaintiff Jesse Plentyhorse states that he noticed blood and feces smeared on the wall of his cell. (Doc. No. 4, Plentyhorse Decl. 1.) Plentyhorse claims he reported this and requested cleaning supplies but received none. (*Id.*) He claims to have experienced severe isolation, and states that he was subjected to constant yelling, screaming, and the smell of feces due to the behavior of other ACU residents. (*Id.*) Like the other Plaintiffs, Plentyhorse also complains of a lack of privacy in the ACU due to the presence of citizen tours appearing without warning while he was showering or working out. (*Id.* at 1–2.)

In their Complaint, Plaintiffs allege that Defendant Mike-Lopez was informed of the cell conditions. (Compl. 8.) In their Declarations, only Plaintiffs Jackson and Kringen claim to have notified her of the filth and the feces present in their cells, and Plaintiff Jackson relates that he asked Defendant Mike-Lopez to clean it up. (Jackson Decl. ¶ 7;

---

[4]    Plaintiff Franco-Morales's case was terminated on March 27, 2019, but this Court will consider his Declaration as it relates to Defendant's Motion for Summary Judgment.

Kringen Decl. ¶ 6.) Both agree that no meaningful follow-up occurred. (*Id.*) Plaintiffs

assert that the emotional injuries brought about by ACU conditions caused them to

experience disrupted sleep, difficulty eating, difficulty concentrating, anxiety, and

depression. (Compl. 9; Kringen Decl. ¶¶ 4–5; Jackson Decl. ¶¶ 1, 3–4; Franco-Morales

Decl. ¶¶ 6–7; Osterloh Decl. ¶ 2.)

### B.    Defendant's Evidence of Conditions in the ACU

MCF-OPH is the highest-level security prison in Minnesota and contains

an Administrative Control Unit that is in turn its most secure living unit. (Doc. No. 123,

Wheeler Aff. ¶ 2.) The ACU is designed to hold offenders deemed dangerous to

themselves or others, or who need to be separated from the general population of the

prison to ensure its orderly operation. (Doc. No. 121, Lopez Aff. ¶ 8.) MCF-OPH

contains a separate segregation unit called Complex 5 that houses offenders less

dangerous than those in the ACU, those with shorter segregation sentences, and those

who are still serving segregation sentences but no longer require placement in the ACU.

(Wheeler Aff. ¶ 3.) Offenders can also be placed on Administrative Control Status

("ACS") after completing a segregation sentence if they continue to pose a threat to

others or themselves, or to the orderly operation of the prison. (*Id.* at ¶ 4; *see* Doc.

No. 121-1, DOC Administrative Control Status Policy.)

Offenders are housed one per cell in the ACU. (Lopez Aff. ¶ 10.) The cells themselves are 95 square feet[5] – sufficient space for the occupants to perform basic exercises such as sit-ups, push-ups, and running in place. (Lopez Aff. ¶ 10; Doc. No. 120, Meyer Aff. ¶ 4.) An ACU cell has its own toilet, sink, shower, desk, bed, and storage area for the occupant's personal belongings. (Lopez Aff. ¶ 10.) The toilets are placed near the cell door but are oriented such that they do not face directly out of the cell. (*Id.* at ¶ 19.) Showers are situated in the back of the cells, but shower curtains are not permitted because staff must be able to see offenders to ensure their safety. (*Id.*)

Every ACU cell features two doors – a large exterior door that leads to an inner "sally port," and a reinforced glass door leading to the cell proper. (Lopez Aff. ¶ 10; Meyer Aff. ¶ 4.) The sally port provides a space for staff to communicate with cell occupants and to securely pass them food and medication, and also increases security as there are two secure doors separating the cell from the hallway. (Lopez Aff. ¶ 10; Meyer Aff. ¶ 4.) ACU cells are staggered and do not face each other so that the offenders cannot easily communicate with each other. (Lopez Aff. ¶ 18; Meyer Aff. ¶ 6.) This layout, combined with the two-door design of the cells themselves, means that noise levels in the ACU are ordinarily no louder than in other units at MCF-OPH despite the fact that more offenders act out in the ACU. (*Id.*) Offenders being housed in the ACU are also permitted to have earplugs in their cells. (*Id.*)

---

[5]     Cells designed to accommodate disabled offenders are larger—126 square feet—and the minimum size recommended by the American Correctional Association is 80 square feet. (Lopez Aff. ¶ 10.)

For security reasons, visitation in the ACU is conducted via video. (Lopez Aff. ¶ 11.) The ACU contains a room designated for such visits. (*Id.*) Offenders who have been living in the ACU up to sixty days—"Phase 1 offenders"—are permitted one hour of video visitation per month and a fifteen minute phone call per week. (Lopez Aff. ¶ 11; *see* Doc. No. 123-1, DOC Segregation Status Grid.) Offenders who have been in the ACU between sixty-one and one-hundred twenty-one days—"Phase 2 offenders"—are permitted one hour of video visitation per month and two fifteen minute phone calls per week. (*Id.*) Those who have been in the ACU for over one-hundred twenty-one days— "Phase 3 offenders"—are permitted two hours of video visitation per month and three fifteen minute phone calls per week. (*Id.*) Phase 1 and 2 offenders are allowed five hours of exercise time per week, while Phase 3 offenders get six hours per week. (*Id.*) Offenders on ACS are allowed three hours of video visitation per month, four fifteen minute phone calls per week, and seven hours of out-of-cell recreation per week. (*Id.*) Out-of-cell recreation time may be modified based on facility needs. (*Id.*)

In the course of a day, residents of the ACU interact with security staff at least forty-eight times as they perform their rounds. (Lopez Aff. ¶ 12; Meyer Aff. ¶ 11.) They may also interact with health services staff on their medication rounds up to three times a day, and health services staff also perform daily wellness rounds. (*Id.*) Each offender housed in the ACU is assigned a mental health therapist who meets with them every thirty days and a caseworker available by kite.[6] (*Id.*)

---

[6]    A kite is a written, intra-prison communication. (Wheeler Aff. ¶ 12.)

MCF-OPH employs a full-time maintenance worker who conducts cleaning in the ACU, including the cleaning of cells in between occupants (Lopez Aff. ¶ 15; Meyer Aff. ¶ 7.) After a cell is cleaned, security staff check the room for security concerns and if they see that the cell is unclean, the maintenance worker is notified and addresses the issue. (*Id*.) When an offender is placed in a cell for the first time, he must complete a room inspection form noting damage to the cell. (*Id*.) Issues with cleanliness can be noted on that form. (*Id*.)

Offenders housed in the ACU are permitted to clean their cells weekly. (Lopez Aff. ¶ 16; Meyer Aff. ¶ 8.) They are provided with cleaning solution, paper towels, and a mop with a bucket of water. (*Id*.) Offenders in the ACU are also given new trash bags and old trash bags are removed. (*Id*.) Upon being placed in the ACU, offenders are provided with a handbook including the unit's procedures. (Lopez Aff. ¶ 9; Meyer Aff. ¶ 8.) That handbook states that it is the offender's responsibility to clean his cell, and that he will have a weekly opportunity to do so. (*Id*.) Offenders can send kites to security staff or the maintenance worker if issues related to cleanliness arise. (Lopez Aff. ¶ 16; Meyer Aff. ¶ 8.) Offenders can request additional cleaning products via kite or verbally. (*Id*.) Offenders may have the opportunity to notify the maintenance worker of any issues verbally as the maintenance worker is present in the ACU periodically. (Lopez Aff. ¶ 21; Meyer Aff. ¶ 8.)

While conducting rounds, security staff are able to see personally if there are any issues with cleanliness in a cell that need to be addressed. (Lopez Aff. ¶ 16; Meyer Aff. ¶ 11.) Additionally, security staff conduct searches of ACU cells weekly. (*Id*.) If security

9

staff become aware that a cell is soiled, they will encourage the offender to clean it himself whenever possible. (*Id.*) If the offender is unable or unwilling to clean the cell, security staff move the offender to a different, clean cell and the maintenance worker cleans the old cell. (*Id.*) The same process applies when an offender smears feces or bodily fluids around a cell. (Lopez Aff. ¶ 17; Meyer Aff. ¶ 9.)

Laundry in the ACU is collected weekly, washed, then returned to the ACU the same week. (Lopez Aff. ¶ 20; Meyer Aff. ¶ 12.) Offenders who have a complaint relating to laundry can write kites and staff would then attempt to remedy the issue. (Lopez Aff. ¶ 20.) Mattresses are equipped with vinyl covers to prevent the absorption of liquids. (Lopez Aff. ¶ 20; Meyer Aff. ¶ 12.) Mattresses can thus be wiped clean using paper towels and cleaning solution. (*Id.*)

Main overhead lights in ACU cells and sally ports are illuminated only during waking hours, while at night cells are lit with night lights. (Lopez Aff. ¶ 13; Meyer Aff. ¶ 5.) Nighttime lighting is required to ensure the safety of ACU residents. (*Id.*) Security lights in the hallway outside of ACU cells are kept on constantly for security reasons though they are dimmed at night. This is because staff need to be able to see as they walk their rounds, and need to be able to visually monitor the hallways to ensure that offenders are not out of their cells. (*Id.*) Lighting in the ACU is similar to other units at MCF-OPH. (Lopez Aff. ¶ 13.)

Ventilation in the ACU is automated and staff can only adjust it if there is a reason to do so. (Lopez Aff. ¶ 14; Meyer Aff. ¶ 10.) If an offender has a concern about

ventilation in the ACU, he may write a kite to security staff or the maintenance worker and the maintenance worker would address the concern. (*Id*.)

Security staff inspect the ACU's outdoor recreation area after an offender is done using it. (Lopez Aff. ¶ 21; Meyer Aff. ¶ 13.) If staff notice an issue with pests in the outdoor area, they notify the maintenance worker and he is tasked with resolving the issue. (*Id*.) A pest control company has a standing appointment with MCF-OPH, visiting twice per month. (Lopez Aff. ¶ 21; Meyer Aff. at ¶ 13.) If an offender has a concern with the outdoor recreation areas in the ACU, he can write a kite or inform the maintenance worker verbally. (Lopez Aff. ¶ 21.)

Defendant served as the Operations Correction Program Director at MCF-OPH during the time Plaintiffs were housed in the ACU. (Lopez Aff. ¶ 7.) Defendant was responsible for the operation of the ACU and Complex 5 at MCF-OPH. (*Id*.) She made weekly rounds in the ACU and states that she did not personally observe any problems with the cleanliness of ACU cells during the time Plaintiffs were confined there, nor was she notified of problems with cleanliness in any ACU cell during the times relevant to this matter. (*Id.* ¶ 23.) Defendant does not recall any Plaintiff verbally informing her of complaints related to the time offenders are confined to their cells, cell layout, lighting, ventilation, cleanliness, noise, visitation, human contact, laundry, or mattresses. (*Id.* ¶ 22.) Defendant represents that had a Plaintiff—or any other resident of the ACU—made such a verbal complaint, she would have attempted to resolve the issue. (*Id.*)

Daniel Meyer—the lieutenant in charge of the day-to-day operation of the ACU—corroborates Defendant's version of events. He made daily rounds in the ACU during the

time Plaintiffs were confined there and never observed any issues with cell cleanliness
except for those caused by the cell occupant. (Meyer Aff. ¶¶ 2, 9.) Meyer, like Defendant,
was never notified of any problems with the cleanliness of the ACU cells. (*Id.* ¶ 9.)
Meyer also does not recall Plaintiffs verbally informing him of their complaints, and
represents that had they done so, he would have tried to remedy the issue. (*Id.* ¶ 8.)

### C. Grievance Procedures in the ACU

At all relevant times in this case, the DOC had a grievance policy setting forth the
procedure by which offenders—including those housed in the ACU—must grieve their
complaint. (*See* Doc. No. 123-1, Grievance Policies 21–32.) Under the DOC's policy, the
first step is for an offender to attempt to informally resolve any issue by sending kites to
staff. (Wheeler Aff. ¶ 12.) Next, the offender must file a formal grievance using a facility
grievance form. (*Id.*) The grievance will then be decided by a facility's warden (or
designee). (*Id.*) In those situations where an offender fears retaliation by prison officials,
he may submit his grievance form directly to the DOC's Central Office. (*Id.*) An offender
may appeal the initial decision; that appeal is decided by either an Assistant
Commissioner or—if the grievance relates to medical or behavioral issues—the Director
of Health Services. (*Id.*) The DOC regards the decision on appeal as its final decision.
(*Id.*)

Offender discipline and an offender's placement on ACS cannot be grieved
through the ordinary grievance process because those matters have their own, parallel
appeal processes. (*Id.* ¶ 13; *see* Doc. No. 123-1, Offender Discipline Policy 33–45.)
However, complaints concerning the conditions of the ACU, ACU cells, laundry,

mattresses, visitation, human contact, or outdoor recreation areas must still be grieved through the standard grievance process. (Wheeler Aff. ¶ 14.) Therefore, the grievance procedure described above is the appropriate avenue for offenders who wish to grieve such issues. (*Id.*)

## II.    Motion for Summary Judgment

Plaintiffs allege a conditions-of-confinement claim under the Eighth Amendment. (*See* Compl.) Plaintiffs request injunctive relief, declaratory relief, compensatory damages, and punitive damages. (*See id.* at 11–13.) Defendant argues that summary judgment is appropriate in this matter for three reasons: (1) Plaintiffs failed to exhaust their administrative remedies; (2) the conditions of Plaintiffs' confinement were not unconstitutional, and even if they were, Plaintiffs cannot establish deliberate indifference on Defendant's part; and (3) Defendant lacked sufficient personal involvement and is entitled to qualified immunity. (Doc. No. 119, Defs.' Mem. 13.) Plaintiffs have filed no response to Defendant's motion.

### A.    Standard of Review

Summary judgment is appropriate if the evidence in the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Thomas v. Heartland Emp't Servs., LLC*, 797 F.3d 527, 529 (8th Cir. 2015). The moving party bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643

F.3d 1081, 1085 (8th Cir. 2011). If the moving party does so, the nonmoving party "may not . . . rest on mere allegations or denials," but must point to evidence "of specific facts which create a genuine issue of material fact." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). The mere existence of a factual dispute will not defeat a motion for summary judgment unless that dispute is "genuine," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendant contends she is entitled to summary judgment on Plaintiffs' remaining claim because they failed to exhaust administrative remedies as to that claim. She also contends she is entitled to summary judgment for various other reasons. The Court will first address the failure to exhaust argument and will then separately address Defendant's other arguments.[7]

### B.     Plaintiffs Failed to Exhaust Administrative Remedies

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."

---

[7]     Because this Court finds summary judgment appropriate on other grounds, it need not address Defendant's arguments regarding the lack of sufficient personal involvement or her entitlement to qualified immunity.

*Porter v. Nussle*, 534 U.S. 516, 532 (2002). This is because the purpose of the PLRA is to reduce the quantity of prisoner lawsuits by giving prison administration an opportunity to take corrective action in response to a prisoner's grievance, thereby avoiding the need for court intercession. *Id.* at 524–25. Prisoners must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). When a plaintiff fails to exhaust the administrative remedies available to him before filing a lawsuit, "dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

In *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016), the Court clarified that there are no "judge-made" exceptions, such as good cause, to the PLRA's exhaustion requirement. Instead, a prisoner must exhaust all "available" remedies, which the Court narrowly defined as all remedies that are "capable of use." *Id.* at 1858. The Court then emphasized that administrative remedies are "unavailable" only under three limited circumstances which "will not often arise": (1) when the process cannot be completed because it is a "dead end," with prison officials "unable or consistently unwilling" to provide any relief; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) when prison officials thwart the inmate through "machination, misrepresentation, or intimidation." *Id.* at 1859–60.

In addition to their Complaint, Plaintiffs filed Declarations (Doc. Nos. 3–7) and a set of Exhibits (Doc. No. 8) consisting of kite forms. None of the kite forms, however, relate to the remaining claim against Defendant Mike-Lopez regarding the conditions of confinement in the ACU, and there is no evidence that Plaintiffs filed a grievance related

15

to any of these conditions in the ACU during or after the time they were housed there. (Doc. No. 122, Ebeling Aff. ¶ 6.) There is no evidence in the record that the Plaintiffs ever filed a grievance concerning the size or cleanliness of ACU cells or the outside recreation areas, video visitation, human contact, lighting, ventilation, cell layout, noise levels, laundry, or mattresses. (Ebeling Aff. ¶ 6.)

In their Complaint, Plaintiffs implicitly concede they failed to properly grieve their complaints by asserting that they are exempt from the requirement that administrative remedies be exhausted because ACS placement cannot be appealed via the standard grievance procedure. (Compl. ¶ 4.) As explained above, while ACS placement has a separate appeal process, complaints concerning ACU conditions do not. (Wheeler Aff. ¶ 14.) Plaintiffs' complaints concerning conditions in the ACU were all subject to the DOC's standard grievance policy.

Filing a grievance is the second step—and first "formal" step—in the DOC's grievance procedure. (*Id.* ¶ 12.) Here, Plaintiffs failed to properly grieve the alleged conditions that give rise to their claim, thus they failed to exhaust their administrative remedies. Plaintiffs' ignorance of the availability of those remedies, while unfortunate, did not render those remedies "unavailable." *Lyon v. Vande Krol*, 305 F.3d 806, 808–09 (8th Cir. 2002). Moreover, while "a failure to exhaust typically warrants only dismissal without prejudice," prejudice may be warranted when an offender fails to file a grievance within the time allowed by DOC policy. *See Allen v. Jussila*, No. 08–6366, 2010 WL 3521934, at *9 (D. Minn. Aug. 5, 2010) ("[B]ecause Allen can no longer exhaust his claims [due to the expiration of the deadline for appealing his prison grievances], he has

16

procedurally defaulted on them and his suit is precluded forever and must be dismissed with prejudice"), *aff'd* 430 F. App'x 555 (8th Cir. 2011). DOC policy requires that an offender file a grievance within thirty days of the occurrence of the issue being grieved. (*See* Doc. No. 123-1, Grievance Policies 28.) More than thirty days have now elapsed since Plaintiffs' were housed in the ACU and Plaintiffs have failed to show that they filed a grievance. Accordingly, this Court concludes that Plaintiffs' claim is procedurally defaulted and recommends that Defendant's Motion for Summary Judgment be granted and Plaintiffs' remaining claim be dismissed with prejudice.

### B.    Conditions of Confinement

The Eighth Amendment prohibits "cruel and unusual punishments," and requires that prison officials provide humane conditions of confinement. U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). "But the Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.'" *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer*, 511 U.S. at 832). "[T]he risk that the prisoner complains of [must] be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (citing

17

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities" and "must also reflect a subjective state of mind evincing deliberate indifferent to the health or safety of the prisoner." *Id.* at 875 (citations and internal quotation marks omitted). This means that to avoid summary judgment, first Plaintiffs must produce evidence that the conditions posed a substantial risk of serious harm in order to satisfy the objective component. Second, Plaintiffs must produce evidence that Defendant actually knew of, but disregarded, or was deliberately indifferent to, a risk to Plaintiffs' health or safety to establish the subjective component. *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003); *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998).

Here, Plaintiffs' Declarations regarding certain conditions conflict with the Defendant's evidentiary support. But at summary judgment, Plaintiffs can no longer rely on "unsupported, self-serving allegations and denials . . . to create a genuine issue of material fact." *Anuforo v. C.I.R.*, 614 F.3d 799, 807 (8th Cir. 2010) (citation omitted); *accord Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). At summary judgment, the nonmoving party must substantiate factual allegations with independent documentary evidence. *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013). The only *independent* documentary evidence provided by Plaintiffs, however, is the Declaration of former Plaintiff Franco-Morales. His Declaration describes feces stains, cells infested with insects, and that Franco-Morales suffered repeated bug bites. (Franco-Morales Decl. ¶ 3.) Franco-Morales admits that exercise was permitted, but complains that the indoor

18

recreational rooms were dusty, dirty, and filled with dead worms and bird feces. (*Id.*) He also complained of a lack of privacy in the ACU due to residents' exposure both to cameras and passersby. (*Id.*) Finally, Franco-Morales stated that other inmates banged on their cell doors all day and night. (*Id.*) It is unlikely that the unsupported Declarations of Plaintiffs and the independent Declaration of Franco-Morales provide sufficient probative evidence to permit a finding in Plaintiffs' favor.

But even assuming that the conditions set forth in Plaintiffs' Declarations rise to the level of a constitutional violation, Plaintiffs' claim against Defendant Mike-Lopez fails because Plaintiffs have not offered sufficient factual support that she was deliberately indifferent. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Deliberate indifference requires that a defendant showed a reckless disregard for a known risk and must be viewed from that defendant's perspective during the time in question. *Patrick v. Lewis*, 397 F. Supp. 2d 1134, 1141 (D. Minn. Oct. 28, 2005) (citations omitted). Only two of the Declarations make any mention of Defendant Mike-Lopez at all, and even then, those merely mention that she was told about the filth and was asked that it be cleaned up, which is insufficient. (*See* Jackson Decl. ¶ 7; Kringen Decl. ¶ 6.) Moreover, the Declarations are silent as to Defendant Mike-Lopez's knowledge of or role in any other condition alleged. Thus, there is no evidence to connect Defendant Mike-Lopez to any of the other conditions alleged.

In contrast, Defendant Mike-Lopez has presented evidence that she was never informed of complaints related to conditions in the ACU while Plaintiffs were housed there, nor (as stated above) did Plaintiffs ever attempt to grieve such issues. (Ebeling Aff.

¶ 6; Lopez Aff. ¶ 23.) Defendant states that she does not recall Plaintiffs verbally notifying her of such complaints on her weekly rounds, nor did she observe any problems related to Plaintiffs' allegations herself. (Lopez Aff. ¶ 22.) Defendant's recollection of this period is corroborated by the lieutenant who oversaw day-to-day operations in the ACU as well as by the fact that Plaintiffs never once filed a grievance related to these matters. (Meyer Aff. ¶¶ 2, 8, 9; Ebeling Aff. ¶ 6.)

Thus, even assuming that Defendant Mike-Lopez was aware of the filth and that she was asked by Plaintiffs to have it cleaned, those facts alone are insufficient to support the objective component of Plaintiffs' claim. Moreover, based on the record this Court concludes that no reasonable jury viewing matters from Defendant's perspective could find that she acted with "a reckless disregard of [a] known risk." *Reynolds*, 636 at 976; *Patrick*, 397 F. Supp. 2d at 1141. In deciding a summary-judgment motion, a court need not accept a nonmoving party's unsupported allegations, *see Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009), conclusory statements, *see Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003), or other statements that are "blatantly contradicted by the record," such that "no reasonable jury could believe" them. *Edwards v. Byrd*, 750 F.3d 728, 733 (8th Cir. 2014); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (stating "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). Accordingly, this Court recommends that Defendant Mike-Lopez's Motion for Summary Judgment be granted.

### D.    Conclusion

At the beginning of this case, the Court found that Plaintiffs had sufficiently pleaded an Eighth Amendment claim against Defendant Mike-Lopez.[8] The applicable standard at the pleading stage required the Court to accept Plaintiffs' factual allegations as true when deciding whether they stated a "claim for relief that is plausible on its face." (Doc. No. 97, Ord. Adopting Report and Recommendation 4 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).) Now, a different standard applies to the determination of Defendant Mike-Lopez's Motion for Summary Judgment. "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999). Plaintiffs have not met their burden. Based on the record available, which Plaintiffs did not supplement after their Complaint and its accompanying Declarations were filed, this Court recommends that Defendant Mike-Lopez's Motion for Summary Judgment be granted.

---

[8]    Because Plaintiffs are *pro se*, when analyzing Defendants' Motion to Dismiss (Doc. No. 61) the Court also considered their Declarations in allowing the claim against Defendant Mike-Lopez to go forward.

## RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.      Defendants' Motion for Summary Judgment (Doc. No. 118) be

**GRANTED**;

2.      Plaintiffs' Complaint (Doc. No. 1) be **DISMISSED WITH PREJUDICE**;

and

3.      Judgment be entered accordingly.


Dated: January 27, 2020.                      *s/ Becky R. Thorson*
                                              BECKY R. THORSON
                                              United States Magistrate Judge



**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).